UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARTINIQUE STOUDEMIRE,

        Plaintiff,

v.                                                                      Case No. 07-15387
                                                                        Honorable Julian Abele Cook, Jr.

MICHIGAN DEPARTMENT OF CORRECTIONS,
a public entity, PATRICIA CARUSO, Director of
the Michigan Department of Corrections, GEORGE
J. PRAMSTALLER, D.O., MDOC Chief Medical
Officer, RICHARD RUSSELL, MDOC Bureau of
Health Care Administrator, SUSAN DAVIS,
Warden, Huron Valley Women's Facility,
MUHAMMAD MUSTAFA, M.D.,  UYEN THAI-
BUDZINSKI, M.D., Nursing Staff JANET
ADAMICK, R.N., ANITA M. LEECH, FRANK
WINTERSTEEN, Corrections Officer ARRIEL N.
DUNAGAN, in their Official and Individual
capacities, jointly and severally,

        Defendants.

<u>ORDER</u>

This litigation relates to issues involving the health care treatment that was administered

to the Plaintiff, Martinique Stoudemire, while she was in the custody of the Michigan

Department of Corrections ("MDOC").  In an amended complaint, Stoudemire has specifically

accused the Defendants[1] of violating her rights under (1) 42 U.S.C. § 1983,  (2) Title II of 42

---

[1]The Defendants in this case have been identified by Stoudemire as Patricia Caruso,
George Pramstaller, Richard Russell, Susan Davis, Janet Adamick, Anita Leech, Frank
Wintersteen and Arriel Dunagan ("MDOC Defendants"), along with independent contracting
physicians, Dr. Muhammad Mustafa and Dr. Uyen Thai-Budzinski ("Independent Doctors).

1

U.S.C. § 12132 and (3) Mich. Comp..Law. § 333.1722.

On July 7, 2010, the "MDOC Defendants" filed a motion which they sought to obtain the dismissal of the complaint against them, as well as procure the entry of a  summary judgment in their favor.  Two days later, the "Independent Doctors" filed a similar request for dispositive relief.  Both motions are now ready for a final resolution by the Court.

I.

At age of ten or eleven years, Stoudemire was diagnosed with Systemic Lupus Erythematosus ("Lupus"), a chronic, inflammatory disease of the immune system which can adversely affect a person's heart, lungs, kidneys, and circulatory system.  In her application for Social Security benefits, she also claims to have suffered from coagulopathy – a tendency to develop blood clots – which requires life-long treatment with anticoagulation medicine.[2]  The latter illness (i.e., coagulopathy) caused Stoudemire to incur circulatory problems, including renal dysfunction and the need for a bypass of an artery in her left leg.

Although she had been treated for both medical conditions prior to being placed in the custody of the MDOC in July of 2002,[3] Stoudemire notes that these diseases were controlled and all of her organs were functioning at that time.  However, when she was released from

---

[2]According to Stoudemire, this malady could have been caused by a number of different causes, including platelet hyperfunction, elevation of fibrogen levels because of inflammation, "Factor VIII" and "von Willebrand factor," and "acquired Protein S deficiency."  She also claims to have experienced a particular form of hypercoagulable state; namely, sticky platelet syndrome, which exists in addition to the coagulation problems that are directly related to her Lupus.

[3]Stoudemire was convicted of six counts of armed robbery and was sentenced to serve a minimum of five years, three months and twenty-six days in prison.  She spent the majority of her term of incarceration at the Huron Valley Women's Correctional Facility in Washtenaw County Michigan.

2

custody five years later, things had changed, in that Stoudemire was a double amputee, having

lost a toe, both legs from the knee down, and was at risk of losing her left arm.  She had also

developed serious kidney problems and other complications while in prison.  Pointing to these

medical maladies, Stoudemire accuses the Defendants in this law suit of creating deficiencies

that are related to their (1) faulty administration of proper health care, (2) failure to maintain her

privacy and confidentiality, and (3) refusal to accommodate her disabilities.

A.      Allegations Concerning Stoudemire's Health Care

In terms of health care issues, Stoudemire, through an amended complaint, accuses the

Defendants of wrongfully denying her anticoagulation medication for at least one year, and

thereafter  providing it only at inadequate, non-therapeutic levels.  She asserts that this failing

by the Defendants caused the formation of blood clots, embolisms, the need for vascular surgery

in her legs, chronic renal failure, cardiac arrest, the loss of her left big toe, and ultimately,

double amputation of her legs. Moreover, it is her position that the Defendants' superficial

medical treatment and the lack of coordinated health care efforts produced a serious form of

pneumonia.      To defend against the Defendants' motions for a summary judgment relating to

her health care concerns, Stoudemire points to several pieces of documentary evidence.  First,

she points to a grievance that was filed by her at the MDOC on August 11, 2002 which should

have put the Defendants on notice of her hypercoagulable medical state.  Stoudemire also

submitted a May 6, 2003 letter to the MDOC administration, in which she, citing to her fragile

medical state (i.e., Lupus, vasculitis, blood clotting, and kidney damage), sought to obtain

regular medical tests, including blood work, leg ultrasounds and urinalyses.[4]  Stoudemire complains that, notwithstanding this request for relief, she did not receive a visit from a doctor regarding these problems until November of 2003 - nearly sixteen months after her incarceration.

In Stoudemire's view, this neglect by the physicians at the MDOC caused her to sustain a number of avoidable adverse reactions. For instance, approximately one month after her first contact with a medical specialist, she experienced vomiting, chest pain, along with a pain and numbness in her left arm, which - according to Stoudemire - was caused by a clot which blocked nearly half the diameter of her descending aorta.  In her opinion - a view point that is shared by Dr. Jerry Walden - such a condition mandates a lifelong regimen of anticoagulation with Coumadin, along with the administration of another drug (Lovenox) following the surgical removal of a blood clot on December 30, 2003.  Upon her discharge from the hospital and immediate return to prison on February 27, 2004,  the Lovenox was discontinued. Thereafter, she was placed on Coumadin that, in her opinion, is a cheaper and less effective drug which requires close monitoring to avoid bleeding or inappropriate clotting.  Furthermore, Stoudemire submits that the alleged failure of  Dr. Muhammad Mustafa thereafter to monitor and maintain her Coumadin dosages at proper therapeutic levels[5] (1) eliminated the possibility that her

---

[4]Stoudemire's pleading attributes the May 6, 2003 letter to her attorney. However, the record indicates that the letter was written in Stoudemire's name, with a courtesy copy provided to her attorney.

[5]To illustrate Dr. Mustafa's allegedly incompetent anticoagulation treatment, Stoudemire says that she was re-hospitalized after being in his care and found to have an "international normalized ratio" ("INR") of 10.4.  According to her, such a value rating indicates she had received more Coumadin than necessary to prevent blood clotting, which, in turn, placed her  in danger of spontaneous bleeding episodes.  Furthermore, Stoudemire contends that there was an

4

arteries could have been kept open and partially recovered, and (2) precipitated the need for the subsequent amputation operation.  She also points to claims of gross neglect by Dr. Thai-Budzinski during her post-amputation period.

Stoudemire also accuses both physicians of, *inter alia*, failing to provide her with appropriate rehabilitative measures after the amputation surgery had been completed. Furthermore, Stoudemire notes, for example, that she did not receive her final right leg prosthesis until more than a full year after her amputation on March 11, 2004.  She also submits that even though both of her arms were at risk of amputation, Dr. Mustafa "flatly refused" to consider her request for a motorized wheelchair.

Furthermore, it is Stoudemire's contention that Dr. Thai-Budzinski acted with a level of similar disregard for her precarious medical condition when he allowed her to be placed in an unsanitary temporary segregation facility after being diagnosed with Methicillin-Resistant Staphylococcus Aureus ("MRSA") in the stump of her newly-amputated leg.   Complaining that this unsanitary temporary segregation facility neither physician took her medical conditions into account nor prescribed a plan which provided for a safe and clean transfer between her wheelchair and the bed, toilet or shower, Stoudemire asserts that the conduct of Dr. Thai-Budzinski, in addition to the other Defendants herein, had the practical effect of deprived her of

---

agreement among several private medical experts in this matter that a primary physician (such as Dr. Mustafa) should have monitored her Coumadin levels more closely and made appropriate adjustments whenever the INRs levels exceeded acceptable therapeutic ranges. She believes that Dr. Mustafa did not satisfy his minimum professional obligations by rarely responding during those occasions when the INRs were too low (i.e. less than 2.0), allowing prolonged periods of time to elapse without any INR testing at all, and failing to control her pain (which was allegedly so intense that it induced her to consent to the then-proposed amputation operation).

basic medical care, shelter and sanitation.

B.      Allegations Concerning Stoudemire's Privacy and Confidentiality

Stoudemire has sued the MDOC Defendants for their violations of her privacy.  One set of allegations pertain to the presence of male and female guards in her hospital room during off-site visits, which enabled them to overhear her medical consultations, observe her examinations, and view her in various states of undress and while using the bedpan.  On similar grounds, Stoudemire seeks damages for a strip search that was conducted on February 10, 2007 by Arriel Dunagan, a corrections officer without any adequate level of privacy.  She claims that Dunagan, without giving her the option of submitting to a pat-down search,[6] ordered her to undergo a strip search without providing a reason. The MDOC Defendants dispute this version of the incident by asserting that Stoudemire unilaterally created the circumstances about which she has complained. In essence, the MDOC Defendants maintain that the claimed embarrassment suffered by Stoudemire was self-imposed.

C.      Allegations Regarding the Lack of Disability Accommodation

Stoudemire alleges that between December 2004 and her release from custody on parole in August of 2007, the MDOC Defendants failed to reasonably accommodate her disabilities while driving her to and from various outside clinics and hospitals.  She claims that rather than placing her in a specially equipped van to transport physically disabled passengers, the MDOC Defendants only utilized regular vans and provided her with no assistance whatsoever in gaining access to and out of the vehicle.

---

[6]The MDOC Defendants dispute this allegation by pointing to the testimony of Dunagan who maintains that Stoudemire fled to her room prior to the routine pat-down search efforts

She also notes that the MDOC staff routinely refused to change her wound dressings, berated her for seeking assistance when using the toilet, refused her requests for showers, and took an unreasonable amount of time to fit her with a prosthetic leg which, in turn, delayed her ability to begin physical rehabilitation. Stoudemire further alleges that the Defendants failed to provide her with assistive devices like orthopedic shoes (following the amputation of her left great toe), grab-bars or a bed trapeze for mobility, a proper chair for using the toilet, or a motorized wheelchair (based on the pain in her limbs and blisters on her hands from infection). Moreover, as indicated above, Stoudemire challenges the decision by the prison authorities to confine her to segregated facilities inasmuch as this arrangement exposed her to unsafe and unsanitary conditions, deprived her of necessary assistance in the treatment of her wounds, caused her to occasionally defecate on herself, and caused her to sustain profound despair and mental health concerns.

II.

Fed R. Civ. P. 8(a)(2) requires an aggrieved party to file a complaint that will provide "a short and plain statement of the claim showing that the pleader is entitled to relief [in order to] give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) and Fed. R. Civ. P. 8(a)(2)). While this pleading standard does not mandate "detailed" factual allegations, it does require more than the bare assertion of legal conclusions. *See Twombly*, 550 U.S. at 555.Thus, the complaint must offer more than "an unadorned, the defendant-unlawfully-harmed me accusation." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Otherwise, it is subject to dismissal under Rule 12(b)(6).

Generally, when considering a motion to dismiss, the Court must construe the complaint in a light that is most favorable to the plaintiff, accept the asserted factual allegations as being true, and draw all reasonable factual inferences in her favor. *Tipton v. Corr. Med. Services, Inc.,* No. 08-421, 2009 WL 2135226 (W.D.Mich. July 15, 2009). However, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Claims are capable of surviving a Rule 12(b)(6) motion only if the "[f]actual allegations [are] enough to raise a right to relief above the speculative level . . . on the assumption that all [of] the allegations in the complaint are true . . . ." *Twombly*, 550 U.S. at 555.

As emphasized by *Iqbal*, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is "plausible" on its face:

> [O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief. *Iqbal*, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)) (internal citations omitted).

*Iqbal*, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)) (internal citations omitted).

Similarly, all of the Defendants have moved for the entry of a summary judgment pursuant to Fed. R. Civ. P. 56©). Under this rule, a  motion for a summary judgment should be granted only if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." The burden is on the movant to demonstrate the

absence of a genuine issue of a material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In assessing a summary judgment motion, the Court is obliged to examine all pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the nonmoving party.  Fed. R. Civ. P. 56©); *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir. 1991); *Bender v. Southland Corp*., 749 F.2d 1205, 1210-11 (6th Cir. 1984). It is the responsibility of the court to determine "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.   A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  Hence, a summary judgment must be entered only if (1) the evidence clearly suggests that the contested matter is "so one-sided that [the proponent] must prevail as a matter of law," *id.* at 252, or (2) the opponent fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  Importantly, the presentation of a mere scintilla of supporting evidence is not sufficient.  *See Anderson*, 477 U.S. at 252, *quoted in Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).

III.

As an initial matter, the Court notes that Stoudemire does not challenge the request by the MDOC Defendants to dismiss her claims against the other Defendants (Caruso, Russell, Pramstaller, Wintersteen, Adamick and Leach) based on violations of 42 U.S.C. § 1983 rooted in the Eighth Amendment (Count I) or the pendent state law claims under Mich. Comp..Law. §

9

691.1407(5) (Count IV) (Plaintiff's Response at DE #86 at page 28).   Accordingly, the MDOC

Defendants' motion for dismissal against these above-identified persons as it is related only to

Counts I and IV is granted.

However, the MDOC Defendants challenge Stoudemire's remaining claims against them

under Counts II and III which will be considered by the Court in turn below.  Moreover,

inasmuch as she has not withdrawn her claims in Counts I and IV against Dunagan, Davis,

Mustafa, and Thai-Budzinski, these issues will also be analyzed..

A.

First, the MDOC Defendants argue that all of Stoudemire's claims against them in their

official capacities are barred by the Eleventh Amendment to the United States Constitution, which

provides:

> The Judicial power of the United States shall not be construed to extend to any suit
> in law or equity, commenced or prosecuted against one of the United States by
> Citizens of another State, or by Citizens or Subjects of any Foreign State.

The Supreme Court has long recognized that the Eleventh Amendment also grants immunity

to a state from those lawsuits that have been initiated in a federal court by its own citizens. *See*

*Hans v. Louisiana*, 134 U.S. 1, 15 (1890).  This immunity extends to any entity that is an "arm of

the state." *See, e.g.,  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).

According to the Sixth Circuit, a lawsuit for monetary damages against a person in his/her official

capacity is treated as an action against the state.  *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545

(6th Cir. 2004) (unless State specifically consents to being sued [thereby waiving sovereign

immunity], such suits are generally barred by Eleventh Amendment).  That notwithstanding,

"Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally

10

intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'"  *Carten v. Kent State University*, 282 F.3d 391, 394 (6th Cir. 2002).

The MDOC Defendants correctly note that a panel of the Sixth Circuit has held that the State of Michigan has not waived its sovereign immunity in §1983 cases.  *See Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004) (citing *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir.1986)); *See also*, *Will v. Michigan Department of State Police*, 491 U.S. 58, 64-66 (1989) (State is not a person within meaning of § 1983). On the basis of this settled authority, the MDOC Defendants' motion to dismiss and for the entry of a summary judgment as it relates to Stoudemire's §1983 claims against Davis and Dunagan in their official capacities must be, and is, granted.

However, this analysis does not apply to Stoudemire's applications for relief under the ADA against all of the MDOC Defendants.  This statute provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

A "public entity" includes any state or local government, as well as any department, agency or instrumentality thereof.  § 12131(1).  A "'qualified individual with a disability' " is defined as a disabled person who, "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  § 12131(2).  The Supreme Court has noted that Congress has expressed an unequivocal intention to abrogate state sovereign

11

immunity by enacting the ADA.  *U.S. v. Georgia,* 546 U.S. 151, 154 (2006).

The parties acknowledge that the Supreme Court opined in *Georgia*, *supra*, that to the extent Title II of the ADA creates a private cause of action for money damages against the States "for conduct that actually violates the Fourteenth Amendment," it validly abrogates state sovereign immunity.  *Id.* at 159 (emphasis in original). Because the claimed misconduct in Stoudemire's complaint (for example, that the Defendants withheld appropriate medications for a life-threatening illness and forced her to navigate a segregated cell with no accommodations for her new status as a double-amputee), if true, supports independent causes of action under Title II and the Eighth Amendment, the Court believes the Congressional abrogation of state sovereign immunity was appropriate.  *Id.* (plaintiff who was permanently confined to wheelchair had sufficiently asserted Eighth Amendment and ADA violations in his pleadings).   Therefore, the Defendants' argument to the contrary must fail and  Stoudemire's ADA claims against the MDOC Defendants survive.

B.

The MDOC Defendants next argue that Stoudemire's claims relating to the pre-December 18, 2004 amputation of her right leg, and left toe are barred by the statute of limitations.  However, the parties agree that the relevant limitations period under Michigan law for personal injury actions - to which § 1983 actions are analogized - is three years.  *See generally, Carroll v. Wilkerson, 782 F.2d 44, 45 (6th Cir. 1986);* Mich. Comp. Law. § 600.5805(10)*.*

*In her responsive brief, Stoudemire disclaims any effort by her to assert a claim for any harms that may have occurred before December 18, 2004. On the other hand, she seeks to proffer information to the Court about those injuries that occurred prior to December of 2004 only as background information relating to the loss of her left leg, kidney failure, and unacceptable*

12

*conditions of confinement thereafter.*

C.

The MDOC Defendants submit that they are entitled to qualified immunity in conjunction with Stoudemire's claims against them in their individual capacities pursuant to 42 U.S.C. § 1983. In order to prevail on her claims under this provision, Stoudemire is required to plead and establish two essential elements; namely, the MDOC Defendants (1) deprived her of a right, privilege, or immunity that has been secured by the United States Constitution, federal statute, or other federal law; and (2) caused this alleged deprivation while acting under the color of state law. *Sigley v. City of Parma Heights,* 437 F.3d 527, 533 (6th Cir. 2006). Here, there is no dispute that the MDOC Defendants were acting under the color of state law at the time of the claimed incidents. Thus, the remaining question is whether any of the MDOC Defendants deprived her of a right that is protected by federal law.

In order to determine whether a government official is entitled to qualified immunity, the Court is encouraged to follow a two-step inquiry as follows:

> First, [the court must] consider whether [t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right. If the answer is yes, next [the court should] ask whether the right was clearly established in light of the specific context of the case.

*Binay v. Bettendorf*, 601 F.3d 640, 646-47 (6th Cir. 2010) (quotation marks and internal citations omitted). However, while the sequence of this two-step inquiry is often appropriate, it is no longer mandatory. *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Two years ago, the Sixth Circuit declared that "[o]nce the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified

13

immunity." *Moldowan v. City of Warren*, 578 F.3d 351, 375 (6th Cir. 2009) (quoting *Silberstein v. City of Dayton*, 440 F.2d 306, 311 (6th Cir. 2006)).  "If a plaintiff fails to show either that a constitutional right was violated or that the right was clearly established, [he] will have failed to carry [his] burden." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).  The burden is high because qualified immunity is intended to protect "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Even at the late stage of summary judgment, the qualified immunity analysis remains a question of law for a judge to decide." *Fettes v. Hendershot*, No. 08-4419, 2010 U.S. App. LEXIS 8784, at *9 (6th Cir. Apr. 27, 2010).  Thus, "[w]hether there is a genuine issue of [a] material fact is immaterial to a qualified immunity analysis because the court assumes the facts are as the plaintiff alleges." *Id*.

Initially, Stoudemire claims that she was subjected to cruel and unusual punishment under the Eight Amendment to the United States Constitution, which forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward [her] serious medical needs." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir.2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

A § 1983 claim that asserts "[a] constitutional [violation] for denial of medical care has objective and subjective components." *Id.* This objective component requires the existence of a "sufficiently serious" medical need, namely one that has either been diagnosed by a doctor as mandating treatment, or one so obvious that even a lay person would recognize the need for medical treatment. *See generally, Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir.2008) (citations omitted). The subjective element requires "an inmate

14

to show that prison officials have 'a sufficiently culpable state of mind in denying medical care.' " *Blackmore*, 390 F.3d at 895; *See also, Mingus v. Butler*, 591 F.3d 474, 480 (6th Cir. 2010).

On this issue, the MDOC Defendants submit that Stoudemire's claim simply sounds in negligence or a disagreement with a prescribed course of medical care.  In support of their argument, these Defendants note that, although anticoagulation medication may have been withheld during the first year of her incarceration (i.e. from July 30, 2002 through July 30, 2003), this time frame falls well beyond the applicable limitations period.  Accordingly, they maintain that during other periods of her incarceration, the gravamen of Stoudemire's claim is that her medication doses were adjusted improperly by her physicians, all of whom did a poor job of managing her care.  According to the MDOC Defendants, these assertions constitute an insufficient basis upon which to establish that they were (1) deliberately indifferent to Stoudemire's claims, and (2) aware of her medical state and consciously disregarded it as an excessive risk to her health or safety.

For her part, Stoudemire appears to allege that her Eighth Amendment claims are not based solely on the lack of coagulation medicines.  Rather, she maintains that it is the same misconduct which gives rise to her claims under the ADA..  Specifically, she points to those reported cases that have rejected a qualified immunity defense in which a paralyzed prisoner was housed in segregation (as opposed to an infirmary).  Stoudemire complains that her cell was not designed for use by a person with severe physical disabilities – especially immediately following a second amputation when she was (1) still experiencing a serious infection and (2) essentially helpless to care for herself from the standpoint of her toilet and bathing needs.

The Court finds that, when viewing the facts in a light most favorable to Stoudemire, the evidence supports her argument (i.e., she suffered from a medical condition in the form of a double

15

amputation and immediate infection, for which the MDOC Defendants failed to reasonably accommodate by providing her with (1) assistive facilities , (2) training on how to care for herself, and (3) other aids that would assist her in meeting her basic health and safety needs). Furthermore, if  Stoudemire is to be believed, the MDOC Defendants neglected to make any reasonable adjustments for her as a brand-new double amputee who could not ambulate within her segregated cell without the assistance of another person.  The MDOC Defendants do not address the merits of this argument in their responsive pleadings, citing only the dispute over anticoagulants.  In the view of the Court, Stoudemire has sufficiently alleged the violation of a clearly established right.  As such, the MDOC Defendants'[7] request to dismiss her Eighth Amendment claim against them  must be denied.

To the extent that the MDOC Defendants seek to assert qualified immunity based on the suits against them in their official capacity, Stoudemire correctly notes that such a defense cannot prevail.  *See generally, Hall v. Tolett*, 128 F.3d 418, 430 (6th Cir. 1997) ("Qualified immunity shields defendant from personal liability, but it does not shield [them] from the claims brought against [them in their] official capacity.") (citing *Kentucky v. Graham,* 473 U.S. 159 (1985)). Inasmuch as Stoudemire has not asserted claims under the ADA against the MDOC Defendants in their individual capacities, the movants' application for dismissal on this ground are equally without merit.  *Everson v. Leis,* 556 F.3d 484, 501 n.7 (6th Cir.  2009).

### D.

The Supreme Court has held that when a prison regulation impinges upon an inmates'

---

[7]In light of Stoudemire's concessions on her Eighth Amendment claims against most of the MDOC Defendants (and the inapplicability of this claim to Dunagan), the analysis by the Court applies only to Davis.

constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. *Turner v. Safley,* 482 U.S. 78, 89 (1987). However, Stoudemire concedes that she is not attempting to assert a claim that the MDOC maintained an unconstitutional policy or practice of conducting strip searches. To the contrary, Stoudemire submits that her position is much narrower, in that her basic constitutional rights were violated by Dunagan who conducted a search without any penological justification and in violation of the MDOC's strip search policy.

In response, the MDOC Defendants claim that Stoudemire, as a prisoner, does not have any Fourth Amendment rights to privacy that are based on a disclosure of her medical documents or on the possible exposure of her partially nude body. In their view, there is no clearly established law which supports Stoudemire's argument on this issue. Hence, they collectively submit that Dunagan is entitled to qualified immunity on the basis of the Fourth Amendment claims by Stoudemire. Furthermore, they cite Sixth Circuit opinions which suggest just the opposite; namely, that the United States Constitution encompasses no general right to non-disclosure of private information. In *Moore v. Prevo*, 379 Fed. Appx. 425 (6th Cir. May 6, 2010) the Sixth Circuit acknowledged that a prisoner could, arguably, have a cognizable claim under the Fourteenth Amendment arising out of an unauthorized disclosure of his HIV-positive status to another inmate. Similarly, the MDOC Defendants opine that an accidental viewing of a naked prisoner by guards of the opposite sex does not automatically amount to a constitutional violation. *Mills v. City of Barbourville,* 389 F.3d. 568, 578-79 (6th Cir. 2004).

Upon a careful review of the record, the Court finds that the Defendants are not entitled to the entry of a summary judgment on Stoudemire's Fourth Amendment claims. Although the Court notes that the record contains conflicting evidence as to whether (1) Stoudemire possessed

17

contraband in the form of a cigarette and matches, and (2) Dunagan ever had a smirk on her face during the strip search, it must adhere to its duty to view these facts in a light that is most favorable to the movants' adversary. With regard to this issue, Stoudemire has submitted an affidavit in which she (1) denies being in possession of contraband during any of the times that are relevant to this case, and (2) affirmatively alleges that Dunagan had declined to advance any reason or administrative policy upon which to conduct the challenged strip search. When viewed in light of this evidence, the Court concludes that Dunagan should have been on notice that such a search would have been unreasonable under the circumstances and not based on a reasonable penological interest of security and order. *See generally, Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir.1992). As such, the MDOC Defendants' motion to dismiss this claim based on qualified immunity must be, and is, denied.

IV.

To the extent that the Court has found several genuine issues of material facts arising out of from Stoudemire's ADA and § 1983 claims against Drs. Mustafa and Thai-Budzinski, their joint request for the entry of a summary judgment in their favor will be denied. *Anderson v. Liberty Lobby, supra* at 252; *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) ("We distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment. Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law. Of course, in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all.") (citations omitted).

18

Here, the Court is satisfied that Stoudemire has presented sufficient information from which a reasonable jury could conclude that these doctors (Drs. Mustafa and Thai-Budzinski,) were deliberately indifferent toward her medical needs while she was incarcerated by the Michigan penal authorities. Moreover, there is evidence that these physicians, despite their awareness that she - as an amputee - required the careful administration and monitoring of Coumadin to control her coagulation problems, chronically failed to maintain her dosage at acceptable therapeutic levels. This failing , in turn, exposed her to the risk of further amputation and/or harm. Furthermore, both doctors, despite having knowledge of her precarious medical condition which stemmed from her double amputation, failed to ensure that she received necessary sanitary and appropriate services, facilities, rehabilitation, and training, including adequate leg prostheses (which, in both instances, were not received until at least seven months after her amputation surgery). Accordingly, their motion for a summary judgment must be, and is, denied.[8]

## V.

Therefore, for the reasons stated above, the MDOC Defendants' motions to dismiss and for summary judgment on Stoudemire's complaint must be, and are, granted in part and denied in part. The motion by the Defendants Caruso, Pramstaller, Russell, Winterstein, Adamick, and Leach to dismiss Counts I and IV against them are granted. However, the remainder of their requests to dismiss are denied. Moreover, the request for the entry of a summary judgment by the Independent Doctors is denied.

---

[8]The Court declines the Defendants' invitation to dismiss this lawsuit on the ground that the claimed inadequate anti-coagulation therapy was not the proximate cause of Stoudemire's amputations. There is a sufficiency of conflicting medical testimony on this issue to preclude the entry of a summary judgment.

Additionally, (1) the parties' motions (at Docket Entry Nos. 73 and 85) for leave to file excess pages in support of their pleadings, and (at Docket Entry Nos. 72, 74, 88, and 98) for permission to file certain sensitive documents under seal (to wit, medical records and MDOC policies) are granted.  As to the latter request, the Clerk of the Court is directed to remove the following items from the public docket and, immediately thereafter, place them under seal: (1) Docket Entry No. 71; (2) Docket Entry Nos. 76-79; (3) Docket Entry Nos. 90-96; and (4) Docket Entry No. 99.

Finally, the parties' joint motion (at Docket Entry No. 108) for permission to modify the dates in the current scheduling order is granted, in light of the documented conflicts on the calendar of the trial counsel in this case.   The new dates are as follows:

| | |
|---|---|
| Submission of Joint Final Pre-Trial Order: | June 13, 2011 |
| Submission of Motions in Limine: | June 13, 2011 |
| Submission of Proposed Jury Instructions: | June 20, 2011 |
| Pre-Trial Conference | June 20, 2011 at 9:30 a.m. |
| Trial Date: | June 28, 2011 at 8:30 a.m. |

IT IS SO ORDERED.


Dated: March 31, 2011                                  s/Julian Abele Cook, Jr.
       Detroit, Michigan                               JULIAN ABELE COOK, JR.
                                                       United States District Court Judge